IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

REX TANNER,                                    }
                                               }
        Plaintiff,                             }
                                               }
v.                                             }        Case No.:  CV 03-P-1117-S
                                               }
DISTRICT 20, UNITED MINE                       }
WORKERS OF AMERICA; UNITED                     }
STATES STEEL MINING                            }
COMPANY, LLC,                                  }
                                               }
        Defendants.                            }

## MEMORANDUM OPINION

### I.    Introduction.

On April 14, 2003, Plaintiff filed his Complaint in the Circuit Court for Jefferson County, Alabama, Bessemer Division. (Doc. #1). Plaintiff sued the United Mine Workers of America ("UMWA"); District 20, United Mine Workers of America ("District 20"); and U.S. Steel Mining Company, LLC ("USM") alleging that UMWA and District 20 breached their duty of fair representation owed to him, and USM breached the collective bargaining agreement in place between the employer and labor organizations. (Doc. #1). On May 12, 2003, Plaintiff voluntarily dismissed the UMWA as a Defendant. (Doc. #1). On May 13, 2003, the Defendants removed this action to this court. (Doc. #1). Presently pending before this court are District 20's Motion for Summary Judgment (Doc. #30) and USM's Motion for Summary Judgment (Doc. #33).

II.     **Statement of Undisputed Facts.**[1]

    A.     The Parties.

Plaintiff Rex Tanner was employed by USM and represented Local 2114, United Mine Worker's Association, as President for over twenty-six years.   USM formerly operated an underground coal mine referred to as the Oak Grove Mine. (Headrick Aff. ¶ 3). USM sold that mine to PinnOak Resources, Inc. in June 2003. (Headrick Aff. ¶ 3). While it operated the mine, USM employed workers on three shifts: (1) the owl shift from 11:00 p.m. until 7:00 a.m.; (2) the day shift from 7:00 a.m. until 3:00 p.m.; and (3) the evening shift from 3:00 p.m. until 11:00 p.m. (Headrick Aff. ¶ 4).  The International Union is called the United Mine Workers of America (UMWA). (Pl. Depo., pp. 43-44 ; Pickett Depo., pp. 25-26).  The UMWA has certain districts, and Plaintiff's local union was located in District 20.  (Pl. Depo., pp. 43-44).  District 20 is considered a labor organization. (Pickett Depo., p. 23).  It is a self-governing body that acts independently from the UMWA. (Pickett Depo., pp. 24, 38).

    B.     The Wage Agreement.

USM is a signatory to a collective bargaining agreement (the "Wage Agreement") along with UMWA, District 20, and Local No. 2133. (Hedrick Aff. ¶ 5; Pl. Global Depo., pp. 42-43; Wage Agreement).  The relevant Wage Agreement became effective on or about January 1, 2002, and was in full force and effect at least up until June 2003, when USM sold the Oak Grove Mine. (Hedrick Aff. ¶ 5; Wage Agreement, p. 1). The Wage Agreement contains a mandatory and detailed grievance and arbitration procedure for the settlement of grievances and disputes.  (Wage Agreement, Art.

---

[1]The court has reviewed the evidence and all factual inferences arising from it in the light most favorable to the nonmoving party.

2

XXIII, pp. 266-76).

Under the Wage Agreement, an employee may be suspended, subject to discharge, for just cause. (Wage Agreement, Art. XXIV, p. 276). If an employee is so suspended, a 24/48 hour meeting is held at which USM may discharge the employee. (Wage Agreement, Art. XXIV, pp. 276-77). The employee may then file a grievance. (Wage Agreement, Art. XXIII, pp. 270-73; Art. XXIV, p. 277). If a grievance is filed, it is referred to a District 20 representative. (Wage Agreement, Art. XXIII, p. 271). Within seven working days, a USM representative and the District 20 representative must attempt to resolve the grievance. (Wage Agreement, Art. XXIII, p. 271). If the District 20 and USM representatives fail to reach a resolution, the grievance may be referred to arbitration. (Wage Agreement, Art. XXIII, pp. 271-72). Settlements reached at any step in the grievance procedure are final and binding on both parties and not subject to further proceedings under the Wage Agreement. (Wage Agreement, Art. XXIII, pp. 274-75). District 20 is the entity that is responsible for presenting grievances at the arbitration level. (Pl. Depo., p. 85, Pickett Depo., p. 80).

C.     The Work Stoppage.

During the owl shift which began on Wednesday, June 19, 2002, at 11:00 p.m. (the Thursday owl shift), two bargaining unit employees, Brian Taylor ("Taylor") and Gary Grace ("Grace") were assigned the responsibility of changing out rollers on the conveyor belts in the Oak Grove Mine. (Hedrick Aff. ¶ 6). At the end of the Thursday owl shift, on June 20, 2002, at approximately 7:00 a.m., Taylor and Grace were issued discipline by USM. (Hedrick Aff. ¶ 6). The foreman who issued the discipline to Grace and Taylor had experienced previous problems with the union. (Pickett Depo., pp. 39-40, 43; McCrary Depo., p. 16). At 11:00 p.m. on Thursday, June 20, 2002, before the

3

beginning of the Friday owl shift, approximately 51 of the 67 bargaining unit employees scheduled to work that shift failed and/or refused to appear at work. (Hedrick Aff. ¶ 6). On the Friday, June 21, 2002, day shift (7:00 a.m. to 3:00 p.m.), approximately 8 of the 67 bargaining unit employees scheduled to work that shift failed and/or refused to appear at work. (Hedrick Aff. ¶ 6). On the Friday, June 21, 2002 evening shift (3:00 p.m. to 11:00 p.m.) approximately 60 of the 73 bargaining unit employees scheduled to work that shift failed and/or refused to appear at work. (Hedrick Aff. ¶ 6).

After discipline was issued to Taylor and Grace, Hank Keeton, a Local 2133 mine committee member[2] met with Larry Pasquale ("Pasquale"), a District 20 representative, at the District headquarters. (Keeton Depo., pp. 8-10). Keeton testified that he was told to strike USM's Oak Grove Mine by Gary Pickett ("Pickett"), a District 20 representative. (Keeton Depo, p. 15). Pickett testified that he did not instruct anyone to strike the mine (Pickett Depo., pp. 22, 27, 59-60). Plaintiff also claims that it was Pickett and District 20 that instigated the strike. (Tanner Aff., p. 25).

On the evening of June 20, 2002, before the initial work stoppage, Jerry Norris and Ron McCrary, local union officials and members of the mine committee, were at service stations (the Grove and Texaco) on routes that lead to the USM Oak Grove Mine. (McCrary Depo., pp. 19-22). Local union members congregated at these service stations and after conferring with local union officials, did not report to work. (McCrary Depo., pp. 21-23, 27). On Friday morning, June 21, 2002, Local 2133 held an automatic meeting. (Pl. Depo., pp. 13-14). It is undisputed that anytime there is a work stoppage an automatic meeting of the Local Union occurs to discuss the strike. (Pl.

---

[2]In June 2002, Hank Keeton, Ron McCrary and Plaintiff were members of Local 2133's mine committee. (Pl. Depo., pp. 15, 45). Jerry Norris was the recording secretary. (Pl. Depo., p. 45).

Depo., p. 58; Pickett Depo., pp. 17-18). Plaintiff testified that at that meeting he instructed everyone to return to work on the next available shift, which would have been the evening shift. (Pl. Depo., p. 60).

Plaintiff was scheduled to work on the evening shift on June 21, 2002, but did not work that day. (Pl. Depo., pp. 26-27). Plaintiff testified that he told the foreman on the owl shift that he would not be at work the next day because he had a meeting a nine o'clock, it was too far to travel, and he was sleepy. (Pl. Depo., pp. 27-28, 97-98). There was no automatic meeting on Saturday, June 22, 2002, after certain of the union employees struck the Friday evening shift. (Keeton Depo., pp. 38-40); *see also* 01/04/03 Arbitration Award, p. 15.).

On June 26, 2002, all the Local 2133 mine committee members including Plaintiff, Keeton, McCrary, and Norris were suspended, subject to discharge, by USM for instigating and participating in a strike. (Hedrick Aff. ¶ 7; Committee Members' Suspension). Thereafter, pursuant to the Wage Agreement, a 24/48 hour meeting was held. (Hedrick Aff. ¶ 7). All four suspensions were converted to discharges at that meeting. (Hedrick Aff. ¶ 7).

At the 24/48 hour meeting, Plaintiff was asked if he had any notes from the automatic meeting held on Friday, June 21, 2002. (Pl. Depo., p. 72). Plaintiff has testified that although he told USM he had notes he did not produce them because USM did not ask for them. (Pl. Depo., pp. 72-73). Plaintiff, as President of the Local Union, also testified that he knew if the Union had a dispute with the company the Union was required to go through the grievance procedure. (Pl. Depo., pp. 47-48). Plaintiff admitted that he also knew employees were not supposed to strike if they had a dispute with the company. (Pl. Depo., p. 48).

Subsequent to the discharge of the mine committee members, the parties attempted to negotiate a resolution of the discharges. (Hedrick Aff. ¶ 8). On July 1, 2002, a conference call was held which included representatives from USM and District 20. (Hedrick Aff. ¶ 8). During that call, the participants reached an oral agreement that: (1) Plaintiff would remain suspended without pay until December 31, 2002; (2) Plaintiff would go on sickness and accident leave from July 1 until December 31, 2002; (3) Plaintiff would receive credit for working one day in the calendar year 2003; (4) Plaintiff would retire under the new thirty and out program after having been credited with one day in the calendar year 2003; and (5) the remaining mine committee members, Keeton, Norris and McCrary would be returned to work without back pay. (Hedrick Aff. ¶ 8). Thereafter, Keeton, Norris and McCrary were returned to work. (Hedrick Aff. ¶ 8). However, Plaintiff refused to enter into a written agreement and continued to assert his grievance regarding his discharge. (Hedrick Aff. ¶ 8).

USM believed that it had entered into a binding settlement agreement of Plaintiff's grievance. The parties agreed to present the issue of whether an oral agreement had been reached to an arbitrator, Thomas Phelan. (Hedrick Aff. ¶ 9). On July 26, 2002, the parties mediated before Phelan the dispute over whether there was a settlement of the grievance. (Pasquale Aff. ¶ 7). Phelan found that the parties had reached an oral agreement on July 1, 2002, during their conference call which included USM and District 20 representatives and Plaintiff. ("07/29/02 Phelan Letter"). Phelan, however, concluded that although the proposed written agreement was not in conflict with the oral agreement, it did not contain all of the specifics of the oral agreement.[3] (Letter from Thomas S.

_____

[3]In any event, the mediation was unsuccessful. It is not altogether clear whether Phelan found that the agreement was unenforceable because it did not contain all of the material terms of the oral agreement or, alternatively, Plaintiff Tanner had reached an oral agreement to retire, but because the

Phelan to Larry Pasquale and Steve Dickerson dated July 29, 2002, re: Mediation, p. 2., "07/29/02 Phelan Letter"). Accordingly, Phelan determined that the written settlement agreement was not enforceable and that Plaintiff could proceed with his grievance. (07/29/02 Phelan Letter, p. 2). Notwithstanding Phelan's ruling regarding Plaintiff, USM permitted Keeton, Norris, and McCrary to return to work. (Hedrick Aff. ¶ 8).

The matter was thereafter referred to a neutral arbitrator, Joseph S. Connavo, Jr. (Pasquale Aff. ¶ 20). On August 20, 2002, Arbitrator Connavo held a hearing on the issue of whether there was a binding settlement agreement. (Pasquale Aff. ¶ 20). The presentation of Tanner's case was handled by District 20 representative, Larry Pasquale. (Pasquale Aff. ¶ 20). In accordance with Tanner's wishes, Pasquale asserted that there was no binding settlement. (Pasquale Aff. ¶ 20). The Arbitrator agreed with Pasquale's position in a written decision dated September 3, 2002, finding that although there was an oral agreement, the settlement could not be enforced because there was no signed, written agreement. (Pasquale Aff. ¶ 20 and "01/07/03 Arbitration Award," Ex. 5).

On October 21, 2002, Arbitrator Connavo convened an arbitration hearing on the merits to determine whether USM discharged Plaintiff for just cause in accordance with the collective bargaining agreement. (01/07/03 Arbitration Award). Pasquale, the District 20 representative, again appeared for the union on behalf of Plaintiff at the arbitration hearing. (Pl. Depo., p. 118). At the hearing, USM argued that Plaintiff had no intention of reporting to work on the day of the strike (Friday evening shift) and that he should have, but did not, direct the employees to report to work. (01/07/03 Arbitration Award, p. 3). USM noted that a vast majority of workers on the evening shift,

---

parties had not executed a written agreement, the terms of the agreement were not enforceable. (Pasquale Aff. at ¶ 17 and Ex. 4 attached thereto).

including Plaintiff, did not show up for work. (01/07/03 Arbitration Award, p. 3). In this regard, USM also argued that if Plaintiff was directing workers to return to work, his own presence at work on that day would have been important. (01/07/03 Arbitration Award, p. 3).

At the arbitration hearing, Larry McCarthy, the General Mine Foreman, testified about the strike. (01/07/03 Arbitration Award, pp. 5-6). McCarthy stated that Plaintiff called him and told him the employees would go back to work. (01/07/03 Arbitration Award, p. 6). McCarthy also testified that Plaintiff did not request time off due to union business. (01/07/03 Arbitration Award, p. 6). McCarthy further said that Plaintiff told him there was a vote about when to return to work. (01/07/03 Arbitration Award, p. 6).

Superintendent Rick Nogosky and General Manager Rusty Hedrick testified that Plaintiff was evasive and non-committal when asked why he did not show up for work. (01/07/03 Arbitration Award, pp. 7-8). Keeton testified at the arbitration that Plaintiff said two or three times that the workers had to go back to work on the evening shift and that they needed to handle the problems as they did in the past. (01/07/03 Arbitration Award, p. 9). Keeton also testified that he never told McCarthy that there was a vote at the special meeting. (01/07/03 Arbitration Award, p. 9). Keeton stated it is standard to have a meeting after work stoppages and he does not know why there was not an automatic meeting on the Saturday after employees failed to show up for work. (01/07/03 Arbitration Award, pp. 9-10). Norris also testified at the arbitration that Plaintiff told them to go back to work. (01/07/03 Arbitration Award, p. 10).

Plaintiff testified at the arbitration that he did not support, condone, authorize or participate in the work stoppage. (01/07/03 Arbitration Award, p. 10). Plaintiff also testified that "we directed that the next shift, evening shift, go to work and file grievances." (01/07/03 Arbitration Award, p.

8

11). On cross-examination, Plaintiff acknowledged that special meetings were automatic after a

work stoppage. (01/07/03 Arbitration Award, p. 11). Plaintiff testified that he did not show up for

work because he was tired and that he never told McCarthy he was not going to work.[4] (01/07/03

Arbitration Award, p. 11). Plaintiff said the men normally listen to him and go back to work.

(01/07/03 Arbitration Award, p. 11).

 The Arbitrator decided that there is a prohibition against participating in an unauthorized

work stoppage at this mine. (01/07/03 Arbitration Award, pp. 12-13; *see also*, Clarke Arbitration

Award). The Arbitrator found that Plaintiff was the Local Union President at the time of an earlier

arbitration award involving a work stoppage, and based upon his personal involvement in the matter

he was aware of the prohibition against such work stoppages, and that discipline could be issued for

such conduct. (01/07/03 Arbitration Award, p. 13). The Arbitrator determined that there was no

showing by the Union or testimony by the Plaintiff that there were such compelling problems, related

to health and safety or anything else that would compel Plaintiff or other employees to resort to self

help. (01/07/03 Arbitration Award, pp. 13-14). The Arbitrator further concluded that:

> There are no witnesses who testified that the Grievant told them not
> to go to work. However, the Arbitrator finds that there is sufficient
> circumstantial evidence that cannot be ignored. The circumstantial
> evidence includes the following findings of facts:
>
> 1) It is standard procedure for an automatic meeting to be held after a
> work stoppage;

---

[4]USM also asserted that Plaintiff changed his story about why he was not at work. It presented evidence that Plaintiff had said, on the one hand, that he had Union business to conduct and then, on the other, that he had something else to do or that he was tired. (01/07/03 Arbitration Award, p. 4). USM also asserted that if a meeting is automatic and standard, and if there had not been a call for a strike, then there should have been an automatic meeting held on Saturday to determine why employees did not report to work on Friday evening. (01/07/03 Arbitration Award, p. 4).

 2) There was no automatic meeting after the work stoppage of the Evening Shift on June 21;

 3) The Grievant did not report to the Evening Shift on June 21;

 4) The Grievant did not call-in and report his absence on June 21;

 5) The Grievant has had influential control over the local members in the past and maintains that control.

(01/07/03 Arbitration Award, p. 14).

 The Arbitrator found it critical that Plaintiff had demonstrated control over the Local Union. (01/07/03 Arbitration Award, p. 15). The Arbitrator noted that Plaintiff had instructed employees to return to work in the past and they had done so (01/07/03 Arbitration Award, p. 15), "[y]et, the Grievant would have the Arbitrator believe that he had no idea what happened or why it happened." (01/07/03 Arbitration Award, p. 15).[5] According to the Arbitrator, at the hearing Plaintiff did not articulate any reason why workers on the evening shift did not report to work on Friday night, June 21. (01/07/03 Arbitration Award, p. 15). The Arbitrator found this to be both not credible and inconsistent with Plaintiff's history at the mine. (01/07/03 Arbitration Award, p. 15). The Arbitrator also pointed to the fact that at no time after the stoppage of the evening shift did Plaintiff make any effort to disclose to USM the reasons for the stoppage. (01/07/03 Arbitration Award, p. 16). As the

------

 [5]Arbitrator Connavo found that in the preceding year, when there had been a similar problem, Plaintiff directed the employees to return to work and they did so. ("01/07/03 Arbitration Opinion Award" dated January 7, 2003, by Arbitrator Joseph Connavo, p. 14.). Plaintiff has consistently asserted that he exercised influential control over his members. ("01/07/03 Arbitration Opinion Award"). Indeed, in a prior arbitration, he told management officials that he could get the employees back to work if the company would promise not to issue disciplinary notices. ("Clarke Arbitration Opinion Award" dated February 9, 1982, by Arbitrator Jack Clarke *In the Matter of the Arbitration Between U.S. Steel Mining Company, Inc. and United Mine Workers of America, District 20, Local Union No. 2133*, Grievance No. CS OG 81-14 p. 6.). However, it is the normal practice of the Local to strike all shifts when one shift goes on strike. (Pl. Depo., pp. 58-59; McCrary Depo., p. 26). The purpose of this practice is to show solidarity among all union workers. (McCrary Depo., p. 26).

Arbitrator expressly found, "[i]f, after all these years of Union leadership and experience in work stoppages and their consequences, the Grievant did not know anything and engaged in non-feasance, then he is just as culpable as if he engaged in malfeasance." (01/07/03 Arbitration Award, p. 16). For these and other reasons, the Arbitrator denied Plaintiff's grievance. (01/07/03 Arbitration Award, p.15). The Arbitrator noted that at the conclusion of the arbitration hearing, Plaintiff testified that he was well represented by his Union and its advocates. (01/07/03 Arbitration Award, p. 16).

### III.   Summary Judgment Standard.

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *See id.* at 323. Once the moving party has met his burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *See id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the

11

evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* 249.

## IV.    Discussion.

Plaintiff alleges both a breach of the duty of fair representation by District 20 and a breach of the collective bargaining agreement by USM.  In such a hybrid action under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, the two claims are interdependent.  To prevail against the employer, the employee must prove not only that the employer breached the collective bargaining agreement, but also that the union violated its duty of fair representation.  Without such a breach of duty, the employee is bound by the outcome of the grievance procedure. *Vaca v. Sipes,* 386 U.S. 171, 185-86 (1967).

There is no explicit statutory requirement setting forth a union's duty of fair representation. Rather, "it is ... a federal obligation which has been judicially fashioned from national labor statutes." *Abrams v. Carrier Corp.,* 434 F.2d 1234, 1251 (2d Cir. 1970).  The courts developed the duty of fair representation as a corollary to a union's status as the exclusive representative for employees in a bargaining unit under Section 9(a) of the National Labor Relations Act.  It was first articulated by the Supreme Court in *Steele v. Louisville & N.R. Co.,* 323 U.S. 192 (1944), and then in *Ford Motor Co. v. Huffman,* 345 U.S. 330 (1953).  The Court later defined the duty as follows:

> The exclusive agent's statutory authority to represent all members of a designated unit includes a statutory obligation to serve the interests of all members without hostility or discrimination towards any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct.

*Vaca,* 386 U.S. at 177.  A breach of the statutory duty occurs when the union's representation is "arbitrary, discriminatory, or in bad faith." *Id.* at 190.  A union's activities are arbitrary, only if, in

light of the factual legal landscape at the time of the union's actions, the union's behavior is so far outside a "wide range of reasonableness" as to be irrational. *Air Line Pilots Ass'n, Intern. v. O'Neill,* 499 U.S. 65, 66 (1991).

The inquiry in a fair representation case is whether the union's acts or omissions show "hostile discrimination" based on "irrelevant and invidious" considerations, or whether they show good faith within the aforementioned "wide range of reasonableness" granted to bargaining agent. *Ford Motor Co. v. Huffman,* 345 U.S. 330, 338 (1953). As long as the union acted "honestly, in good faith, without hostility or arbitrary discrimination," the union does not breach its duty of fair representation. *Humphrey v. Moore,* 375 U.S. 335, 350 (1964). Mere negligence does not constitute a breach of the duty of fair representation. *Le'Mon v. N.L.R.B.,* 952 F.2d 1203 (10th Cir. 1991). Furthermore, "the union is to be accorded a wide range of discretion in dealing with representation matters, and its actions are to be judged under a standard of reasonableness." *Papavaritis v. Communication Workers of America, AFL-CIO,* 772 F.Supp. 604, 607 (S.D. Fla. 1991). "The mere fact that [the] union was ineffective or did not zealously prosecute the plaintiff's claim is insufficient, without more, to support a fair representation claim." *Id.*

As noted earlier, an employee's hybrid claims against his employer under Section 301, and against his union under the NLRA, are interdependent. In order to prevail, the employee must satisfy his burden of proving both a breach of the terms of the collective bargaining agreement by the employer and a breach of the union's duty of fair representation. *See DelCostello v. International Brotherhood of Teamsters,* 462 U.S. 151, 164-65 (1983); *Coppage v. U.S. Postal Service,* 281 F.3d 1200, 1204 (11th Cir. 2002); *Parker v. Connors Steel Co.,* 855 F.2d 1510, 1519 (11th Cir. 1988). Therefore, a Section 301 claim against the employer fails upon a finding that the union did not

13

breach its duty of fair representation of the employee. *Parker,* 855 F.2d at 1521; *Smith v. Babcock & Wilcox Co.,* 726 F.2d 1562, 1564 (11th Cir. 1984) ("The indispensable predicate for a 301 action, therefore, is a showing that the union has breached its statutory duty of fair representation."). Accordingly, if there is no genuine issue of material fact in dispute, and District 20 is entitled to judgment as a matter of law on the breach of duty of fair representation claim, then the breach of contract claim against USM also fails as a matter of law.

As the Eleventh Circuit has made clear, a union is allowed considerable latitude in its representation of employees. *See Parker,* 855 F.2d at 1520; *Harris v. Schwerman Trucking Co.,* 668 F.2d 1204, 1205-06 (11th Cir. 1982) (explaining standards noting that "[t]he grievance and arbitration process is not conducted in a judicial forum and union representatives are not held to strict standards of trial advocacy."); *see also Freeman v. O'Neal Steel, Inc.,* 609 F.2d 1123, 1127 (5th Cir. 1980) ("The union representative is not a lawyer and he cannot be expected to function as one.").

Courts have consistently held that neither negligence nor a mistake in judgment is sufficient to support a claim that the union breached its duty of fair representation. *Parker,* 855 F.2d at 1521; *Harris,* 668 F.2d at 1206 (emphasis added). "The union is accorded a 'wide range of reasonableness' in the exercise of its discretion, and although it is circumscribed by a duty to act with 'complete good faith and honesty of purpose,' the employee's burden is a substantial one." *Harris,* 668 F.2d at 1206 (quoting *Ford Motor Co. v. Huffman,* 345 U.S. 330, 338 (1953)).

In *Harris,* the employee appealed from an order granting summary judgment in favor of the employer and the union in the employee's suit challenging his discharge and the union's representation of him. 668 F.2d at 1205. The Eleventh Circuit stated that, "[n]othing less than a demonstration that the union acted with reckless disregard for the employee's rights or was grossly

14

deficient in its conduct will suffice to establish such a claim . . ." and ineptness or ineffectiveness is not an appropriate standard by which to evaluate a claim of perfunctory conduct. *Id.* at 1206-07. The court of appeals also held that the conduct of the union, which provided the employee with a representative who assisted with the grievance, explained the employee's grievance and spoke in rebuttal to the employer's presentation, was not so perfunctory as to be a breach of its duty of fair representation. *Id.* at 1207.

Plaintiff's contentions about District 20's breach of its duty of fair representation based upon his complaint, deposition testimony, and opposition to summary judgment relate to Plaintiff's allegations in the following areas: (1) failing to offer the minutes from the Friday, June 21, 2002 automatic meeting and/or testimony about the minutes (and that they supported Plaintiff's position at the arbitration hearing); (2) failing to further corroborate Plaintiff's version of the facts by offering the testimony of two specific management employees, other witnesses, and company records at the arbitration hearing; (3) conspiring to force Plaintiff to retire; and (4) representing Plaintiff at the hearing even though an alleged conflict of interest existed in light of Plaintiff's assertion that it was a District Representative who called for the illegal work stoppage.

A.     The Failure to Offer the Automatic Meeting's Minutes.

Plaintiff contends that District 20 breached its duty of fair representation because it refused to present evidence, the written minutes of the automatic meeting, to the arbitrator. (Pl. Depo., pp 117-22). The minutes Plaintiff claims should have been offered into evidence state that Plaintiff told the membership to return to work on the evening shift. (Minutes). Plaintiff claims that the minutes were supposed to have been introduced while Norris was testifying. (Pl. Depo., p. 120). Plaintiff acknowledges that Pasquale attempted to introduce them after closing but the Arbitrator would not

accept them. (Pl. Depo., p. 121). When asked if it was his position that Pasquale "screwed up by not offering the minutes in earlier," Plaintiff testified that he would take the position that Pasquale "knew what needed to be done," and that they had discussed it the day before in the pre-arbitration meeting. (Pl. Depo., pp. 127-28).[6]

Plaintiff's argument about the minutes fails for at least three reasons. First, District 20 did not refuse to present the minutes. (Pl. Depo., pp. 126-28). The evidence is undisputed that District 20 tried to present the minutes but the arbitrator refused to accept them. (Pl. Depo., pp. 126-27). Thus, at worse, District 20's handling of the minutes could be viewed as a mistake or negligence. Whether the District should have submitted the minutes from the Friday meeting, in addition to the oral testimony on the same issue, is a matter within the wide range of reasonableness afforded to a union in pursuing a grievance. *Harris*, 668 F.2d at 1206. Tactical errors are insufficient to show a breach of the duty of fair representation. The grievance process cannot be expected to be free or errors. *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 571 (1976).

Second, the Union's unsuccessful attempt to introduce the minutes did not prevent it and Plaintiff from calling several witnesses who testified to the substance of the minutes. (01/07/03 Arbitration Award, pp. 9-10). Therefore, actual physical introduction of the minutes would have little if any impact on the arbitrator's decision. The Arbitrator's rational for his decision in no way

---

[6]Pickett testified in his deposition that the minutes Plaintiff wanted admitted were forged. (Pickett Depo., pp. 99-109). Pickett testified that Pasquale informed him that the original minutes indicated that the Local Union had voted to go back to work on the owl shift and not on the evening shift, which would have been the next available shift. (Pickett Depo., pp. 104-05, 107-09). Pickett testified that Norris rewrote the minutes. (Pickett Depo., p. 102). Pickett learned about the forged minutes after Plaintiff's 24/48 meeting. (Pickett Depo., p. 106). According to Pickett, Pasquale told Norris the original minutes "needed to go" or something to that effect. (Pickett Depo., pp. 107, 109). Pasquale purportedly said this in order to protect the Local Union. (Pickett Depo., p. 100).

relied on the existence or nonexistence of the minutes in question.

Finally, Norris testified – consistent with the minutes Plaintiff asserts should have been offered during his (Norris') testimony – that Plaintiff told employees to go back to work. (01/07/03 Arbitration Award, p. 10). Accordingly, the minutes would only have corroborated Norris' testimony.

Plaintiff's challenge that persons with knowledge of the contents of the minutes should have been called as witnesses during the hearing is simply a non-issue. As noted above, the record on summary judgment reflects that individuals did, in fact, testify about the substance of the minutes at the hearing. (01/07/03 Arbitration Award, pp. 9-10). The Arbitrator took this testimony into account, and any other oral testimony about the minutes would have been cumulative and unnecessary.

B.      The Failure to Corroborate Plaintiff's Version of the Facts.

Plaintiff also maintains that District 20 breached its duty of fair representation at the arbitration by failing to corroborate his version of the facts. More specifically, Plaintiff faults District 20 for not calling Paul Boyd and Bill Freeman as witnesses to Plaintiff's seeking permission to miss work on June 21, 2002, and for not offering supportive company records regarding his work schedule during the strike. Plaintiff believes that the failure to present this evidence led the Arbitrator to conclude that Plaintiff was not credible and that he must have had something to do with the strike. However, the Arbitrator's decision made clear that District 20 proffered (and the Arbitrator considered) other similar facts about Plaintiff's assertions, *i.e.*, that he was not behind the strike and had instructed employees to return to work. Nevertheless, the Arbitrator found there was sufficient circumstantial evidence to support the finding that Plaintiff was discharged for just cause.

17

Moreover, Plaintiff's lack of any knowledge about the strike coupled with his historical and influential control over local union members caused the Arbitrator to doubt Plaintiff's credibility and make what was in essence a finding of non-feasance. (01/07/03 Arbitration Award, p. 15, 16).

      C.     The Alleged Conspiracy.

Plaintiff next contends that District 20 conspired with USM to force Plaintiff to retire against his will and that as a consequence of his refusal to retire, District 20 failed to fairly represent him. (Comp. ¶ 8). There is simply no evidence to support this conspiracy theory.

After Plaintiff was discharged, the parties attempted to resolve Plaintiff's grievance. (Hedrick Aff. ¶ 8). The parties purportedly reached an agreement resolving the grievance. However, Plaintiff refused to sign the written settlement agreement. (Hedrick Aff. ¶ 8). The parties then agreed to present the issue of whether an oral agreement had been reached to a mediator. (Hedrick Aff. ¶ 9). The mediator found that the parties had reached a verbal agreement (07/29/02 Phelan Letter), but that while the written agreement drafted by USM did not conflict with the verbal agreement, it did not reflect all of the specifics of the verbal agreement. (07/29/02 Phelan Letter). The mediator concluded that the problem with the written agreement could be easily cured with a clarification indicating that Plaintiff would be deemed eligible for S&A benefits and his eligibility would not be challenged by the Company. (07/29/02 Phelan Letter).

Plaintiff rejected the mediator's suggestion. Consequently, a hearing was conducted before Arbitrator Connavo on the "settlement" issue. Pasquale successfully asserted on Plaintiff's behalf that there was no binding settlement agreement. Pasquale, upon prevailing in that initial hearing, also represented Plaintiff at the heraing on the merits. During the hearing on the merits, Plaintiff acknowledged to the Arbitrator that he was well represented by his Union and its advocates.

It is undisputed that Plaintiff was involved in all settlement discussions concerning his grievance. It is equally clear that District 20 represented him before the mediator and successfully argued that there was no enforceable settlement agreement. (07/29/02 Phelan Letter). It also represented him at the hearing on the merits. Based on these undisputed facts contained in the Rule 56 record, it simply cannot be said that there was evidence of any conspiracy to force Plaintiff to retire.

D.     The Alleged Conflict of Interest.

Plaintiff also apparently contends that District 20 breached its duty of fair representation owed to him because it had a conflict of interest. Plaintiff alleges a conflict of interest exists because he claims there is a dispute over who first called the illegal work stoppage, District 20 or Local 2133. Plaintiff's argument is off the mark.

First, it is of no import whatsoever whether District 20, Local 2133, or some other unknown third party first called the strike. The simple fact is that Plaintiff was terminated because he instigated and participated in the illegal work stoppage, not because he was the first person who called the strike. (Hedrick Aff. ¶ 7). Even if District 20 called the strike, Plaintiff knew it was wrong to participate and was not required to do so. The Arbitrator noted that Plaintiff was aware of the prohibition against participating in an unauthorized work stoppage at the Oak Grove mine and of the fact that discipline could be issued for engaging in an unauthorized work stoppage. (01/07/03 Arbitration Award, p. 13). Thus, regardless of who called the strike, Plaintiff knew the strike was illegal and the Arbitrator found he did nothing to prevent it. Further, the strike which led to Plaintiff's discharge was not the Thursday owl shift strike, but rather was the Friday evening shift which was Plaintiff's shift and which occurred after the meeting he chaired. (Hedrick Aff. ¶ 6;

01/07/03 Arbitration Award, pp. 14-15). Thus, there is no substantial evidence of any conflict of interest.

Second, Plaintiff has not presented any evidence that the Union took a position in arbitration adverse to him. District 20 presented evidence at the arbitration hearing that rebutted USM's contention that Plaintiff was discharged for just cause. (01/07/03 Arbitration Award, p. 5). It also elicited testimony from multiple committee members (and Plaintiff himself) that Plaintiff instructed the men to return to work. (01/07/03 Arbitration Award, pp. 9-10). Despite this testimony, the Arbitrator stated that there was sufficient circumstantial evidence supporting Plaintiff's discharge. (01/07/03 Arbitration Award, p. 14). Specifically, the Arbitrator relied on the fact that there was not an automatic meeting held after the work stoppage on June 21, that Plaintiff did not report to work on June 21, and despite Plaintiff's influential control over the men in the past there was still a work stoppage on his shift. (01/07/03 Arbitration Award, p. 14). Furthermore, the Arbitrator pointed to the fact that after the stoppage Plaintiff failed to make any effort to disclose to USM the reasons for the stoppage. (01/07/03 Arbitration Award, p. 16).

Defendants have cited several cases that support their position in this case. For example, in *Williams v. Romano Brothers Beverage Co.*, 939 F.2d 505, 507 (7th Cir. 1991), the Seventh Circuit determined that the plaintiff had not indicated how the union's conflict of interest had affected his arbitration and that the arbitrator's award was based on relevant and appropriate evidence. The conflict of interest stemmed from the fact that the union's officers, as well as the attorney who represented the plaintiff at arbitration, were involved in a business relationship with the employer. *Id.* Accordingly, the Seventh Circuit upheld motions to dismiss filed by the union and employer.

20

Also, in *Lettis v. United States Postal Service*, 39 F. Supp. 2d 181, 198 (E.D.N.Y. 1998), the plaintiff was discharged after he was involved in an altercation with a coworker. The plaintiff contended that the Union's representation of both him and the coworker at step one of the grievance proceedings presented a conflict of interest. *Id.* The District Court held that "[a]bsent a showing that the union actually took a position in arbitration adverse to [the grievant], petitioner cannot prevail." *Id.* (quoting *Mackey v. James Seeman Studios, Inc.*, 509 F. Supp. 1046, 1046-47 (S.D.N.Y. 1981)); *see also Griesmemer v. Retail Store Employees Union*, 482 F. Supp. 312 (E.D. Pa. 1980) ("That the local union representative's brother worked for the international union does not By [sic] itself suggest bad faith unless plaintiff alleges that the brother participated in processing plaintiff's grievance and thereby obstructed or subverted a fair and impartial disposition."); *Watson v. International Bhd. of Teamsters*, 399 F.2d 875 (5th Cir. 1968) (less than enthusiastic representation in the grievance procedure did not breach the union's duty of fair representation, and was understandable in view of the fact that the union had procured and negotiated the side agreement regarding "casual" employees which was being attacked by the grievances); *Bowen v. Lockheed-Georgia Co.*, 309 F. Supp. 1210, 1213 (N.D. Ga. 1970) (no breach of the duty of fair representation where a union in good faith takes a position contrary to that of some individuals whom it represents, or supports the position of one group of members against that of another, or agrees to action having adverse repercussions on a particular group of its members) (citations omitted); *Hague v. United Paperworkers Int'l Union*, 949 F. Supp. 979 (N.D.N.Y. 1996) (relying on cases holding that no conflict is present when union counsel who represented the union in handling an employee's grievance subsequently represented the union when the dissatisfied employee brings a §301 claim, court held that the fact that the counsel hired by the union for the arbitration proceedings represented the union rather than the

employee, did not give rise to a conflict of interest sufficient to support employee's claim that the union violated its duty of fair representation.).

There is no substantial evidence of an alleged conflict of interest. Further, and in any event, there is insufficient evidence to show that any alleged conflict undermined the arbitral process. Accordingly, USM is entitled to summary judgment as a matter of law. *Hines*, 424 U.S. at 568.

      D.    USM is Entitled to Summary Judgment Because USM Did Not Breach the Collective Bargaining Agreement.

A breach of the duty of fair representation by the union is a condition precedent to Plaintiff's breach of contract claim against USM. *Vaca*, 386 U.S. at 186. As Plaintiff can show no such breach by the Union, there can be no breach of contract claim against USM. However, even if District 20 breached its duty of fair representation, the undisputed evidence is that USM nevertheless discharged Plaintiff for just cause. The proper standard in reviewing an arbitrator's decision is one of considerable deference. *Osarm Sylvania, Inc. v. Teamsters Local Union 528*, 87 F.3d 1261, 1262 (11th Cir. 1996); *Florida Power Corp. v. International Bhd. of Elec. Workers*, 847 F.2d 680, 681-82 (11th Cir. 1988) ("Perhaps the single most significant and common issue to which this deference extends is the issue of what constitutes sufficient and reasonable cause for discharge."). As discussed above, the Arbitrator thoroughly considered the evidence and concluded that Plaintiff's discharge was justified. Plaintiff has presented no evidence to the contrary. Thus, there can be no breach of contract and USM is entitled to summary judgment for this reason as well.

Finally, there is a substantial question of whether, even if District 20 breached its duty of fair representation (and again the court finds it did not), Plaintiff can establish that District 20's alleged breach actually affected the outcome of his arbitration. The Supreme Court stated as follows:

> Where the union actually utilizes the grievance and arbitration procedures on behalf of the employee, the focus is no longer on the reasons for the union's failure to act but on whether, contrary to the arbitrator's decision, the employer breached the contract and *whether there is a substantial reason to believe that a union breach of duty contributed to the erroneous outcome of the contractual proceedings.*

*Hines*, 424 U.S. at 568 (emphasis supplied); *see also Camacho v. Ritz-Carlton Water Tower*, 786 F.2d 242, 246 (7th Cir. 1986) (*Hines* "suggests that there must be a breach of duty by the union that also caused injury in the sense that the employee would have been vindicated but for the union's dereliction."). As the Sixth Circuit explained:

> In the context of a hybrid 301 action, absent a finding that an erroneous arbitral decision has been reached, the inquiry into the union's failure to comply with its duty of fair representation becomes immaterial, and is not justiciable. Thus, the ultimate issue with respect to the claim against the union in any hybrid 301 case is whether the alleged breach of the duty of fair representation "contributed to the arbitrator's making an *erroneous* decision."

*White v. Anchor Motor Freight, Inc.*, 899 F.2d 555, 560 (6th Cir. 1990) (citations omitted) (emphasis in original). Plaintiff has failed to show how any breach of the duty of fair representation by District 20 contributed to an erroneous decision by the Arbitrator. As previously discussed, there was testimony by mine committee members and Plaintiff himself that Plaintiff instructed the men to return to work. (01/07/03 Arbitration Award, pp. 9-11). Despite this testimony, the Arbitrator stated that there was sufficient circumstantial evidence supporting Plaintiff's discharge. (01/07/03 Arbitration Award, p. 14). Accordingly, Plaintiff cannot state a hybrid Section 301 claim and USM is entitled to summary judgment as a matter of law.

## V.   **Conclusion.**

District 20 satisfied its duty to fairly represent Plaintiff at the arbitration hearing. (01/07/03

Arbitration Award, pp. 13, 16). District 20 provided Plaintiff with a representative to assist him with the grievance process. (Pl. Depo., p. 118). Plaintiff, the Local Union President, was quite familiar with the arbitration process. (01/07/03 Arbitration Award, p. 13). Even before Plaintiff's arbitration hearing on his discharge, District 20 represented Plaintiff and successfully argued that he had not entered into a binding settlement agreement with respect to his grievance. (07/29/02 Phelan Letter). At the hearing on the merits, District 20 presented witnesses on behalf of the Plaintiff who testified in his favor. (01/07/03 Arbitration Award, pp. 9-10). The District 20 representative also cross-examined the company representatives. (01/07/03 Arbitration Award, pp. 6-8). The District 20 representative provided argument on behalf of Plaintiff. (01/07/03 Arbitration Award, p. 5). Thus, District 20 satisfied its duty to fairly represent Plaintiff, and there is no evidence that District 20's representation was conducted in any manner other than in good faith. Indeed, as the Arbitrator noted at the conclusion of the hearing, Plaintiff acknowledged he was well represented by his Union and its advocates. (01/07/03 Arbitration Award, p. 16). For these reasons, Defendants' motions for summary judgment are due to be granted.

DONE and ORDERED this ___5th___ day of October, 2004.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE